IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

WALTER LOONEY, JR.,                    )
            Plaintiff,                  )
                                        )
      v.                                )      Civil No. 3:17cv450 (DJN)
                                        )
NANCY A. BERRYHILL,                     )
Acting Commissioner of Social Security, )
            Defendant.                  )
_____)

MEMORANDUM OPINION

On November 4, 2013, Walter Looney, Jr., ("Plaintiff") applied for Supplemental

Security Income ("SSI") and Disability Insurance Benefits ("DIB"), alleging disability from

bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), hepatitis C, malignant

hypertension, congestive heart failure and metal pins in his right foot, with an alleged onset date

of July 1, 2010. The Social Security Administration ("SSA") denied Plaintiff's applications both

initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied

Plaintiff's claims in a written decision and the Appeals Council denied Plaintiff's request for

review, rendering the ALJ's decision as the final decision of the Commissioner.

Plaintiff seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in failing to properly analyze the opinion evidence, relying on

vocational expert ("VE") testimony without properly addressing Plaintiff's post-hearing

objections and neglecting to consider Plaintiff's strong work history in his assessment of

Plaintiff's credibility. (Br. in Support of Pl.'s Mot. For Summ. J. ("Pl.'s Br.") (ECF No. 15) at

4.) This matter now comes before the Court by consent of the parties pursuant to 28 U.S.C.

§ 636(c)(1), on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[1] For the reasons that follow, the Court hereby DENIES Plaintiff's Motion for Summary Judgment (ECF No. 14), GRANTS Defendant's Motion for Summary Judgment (ECF No. 16) and AFFIRMS the final decision of the Commissioner.

## I.     PROCEDURAL HISTORY

On November 4, 2013, Plaintiff filed applications for DIB and SSI with an alleged onset date of July 1, 2010. (R. at 15, 76-77, 218-24.) The SSA denied Plaintiff's claims initially on September 4, 2014, and again upon reconsideration on November 12, 2014. (R. at 144-56, 160-69.) At Plaintiff's written request, the ALJ held a hearing on March 3, 2016. (R. at 39-73.) On April 29, 2016, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because Plaintiff could perform work as a packer and sealer, inspector or marker. (R. at 15-29.) On April 19, 2017, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-3.)

## II.     STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

---

[1]     The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential

evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite his physical and mental limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform his past work given his RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.    THE ALJ'S DECISION

On March 3, 2016, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 37-73.) On April 29, 2016, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 15-29.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 16-17.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 1, 2010. (R. at 17.) At step two, the ALJ determined that Plaintiff had the following severe impairments: heart disease; gastroesophageal reflux disease ("GERD"); liver disease; ADHD; bipolar disorder; anxiety disorder; and, a history of substance abuse. (R. at 17.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.)

4

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work. (R. at 21.) However, Plaintiff could not climb ladders, ropes or scaffolds, but he could perform other postural maneuvers including occasional balancing and stooping. (R. at 21.) Plaintiff could occasionally push, pull and reach overhead. (R. at 21.) Plaintiff could perform simple, routine tasks of up to three steps, sustain concentration for two-hour segments and interact with co-workers and supervisors on an occasional basis with no significant public contact. (R. at 21.) Plaintiff could not perform any work involving significant reading or writing. (R. at 21.)

At step four, the ALJ found that Plaintiff could not perform any past relevant work. (R. at 27.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy, including as an inspector, a marker and a packer and sealer. (R. at 28.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 29.)

## IV.    ANALYSIS

Plaintiff, fifty-one years old at the time of this Opinion, previously worked as a heavy equipment operator. (R. at 43.) He applied for Social Security Benefits, alleging disability from bipolar disorder, ADHD, hepatitis C, malignant hypertension, congestive heart failure and metal pins in his right foot, with an alleged onset date of July 1, 2010. (R. at 15, 76-77, 218-24.) Plaintiff's appeal to this Court alleges that the ALJ erred in failing to properly analyze the opinion evidence, relying on the VE's testimony without properly addressing Plaintiff's post-hearing objections and neglecting to consider Plaintiff's strong work history in his assessment of Plaintiff's credibility. (Pl.'s Br. at 4.) For the reasons set forth below, the ALJ did not err in his decision.

## A. Substantial Evidence Supports the ALJ's Assignments of Weight.

Plaintiff argues that the ALJ failed to properly analyze the opinions of his treating psychiatrist, Norman Holden, M.D., and of the Agency's psychological examiner, Elizabeth Hrncir, M.D., and that if properly credited, these opinions would establish Plaintiff's inability to perform the basic demands of competitive employment. (Pl.'s Br. at 14-25.) Plaintiff states that the ALJ failed to give "good/specific/supported" reasons for rejecting these opinions that, when viewed together, align with the record. (Pl.'s Br. at 19-25.) Defendant responds that the ALJ appropriately weighed these opinions. (Br. in Support of Def.'s Mot. For Summ. J. ("Def.'s Br.") (ECF No. 16) at 20-25.) Defendant argues that the ALJ appropriately concluded that both opinions relied too heavily on Plaintiff's subjective complaints. (Def.'s Br. at 20-21, 23.) Defendant also argues that the ALJ appropriately gave Dr. Hrncir's opinion partial weight, because the overall record supported her findings about Plaintiff's ability to perform simple, repetitive tasks. (Def.'s Br. at 23.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927. When the record contains a number of different medical opinions, including those from the claimant's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. §§ 404.1527(c), 416.927(c). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the

opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-3p. Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. §§ 404.1513(d), 416.913(d).[2]

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. §§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d 858,867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.[3] Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or

---

[2]    The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a). The given examples are a non-exhaustive list.

[3]    Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, and it no longer applies the "treating physician rule." 20 C.F.R. §§ 404.1520c, 416.920c (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. §§ 404.1520c(a), (c)(1)-(2), 416.920c(a), (c)(1-2). Plaintiff filed his claim on November 4, 2013, before the regulation took effect. (R. at 15, 76-77, 218-24.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 96-2p and 06-3p apply to Plaintiff's claim.

when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

### 1. Dr. Holden's Opinion

Dr. Holden's treatment of Plaintiff began on August 26, 2014, and Plaintiff attended four therapy sessions with him over the next year. (R. at 1029-31.) On June 1, 2015, Dr. Holden completed medical source statements describing Plaintiff's anxiety and depression. (R. at 856-63.) Dr. Holden opined that Plaintiff had marked restrictions in his activities of daily living and marked episodes of deterioration or decompensation in work or work-like settings. (R. at 857.)

He also opined that Plaintiff had extreme difficulty maintaining social functioning and deficiencies in concentration, persistence or pace. (R. at 857.) Dr. Holden noted that Plaintiff experienced a persistent irrational fear of social situations — namely the grocery store — which resulted in a compelling desire to avoid them. (R. at 856.) Dr. Holden further noted that Plaintiff had symptoms of full or partial depressive syndrome including anhedonia, appetite and sleep disturbances, psychomotor agitation or retardation, decreased energy, difficulty concentrating and a history of suicidal ideation. (R. at 860.)

The ALJ afforded Dr. Holden's opinion little weight, because it did not mention Plaintiff's long-term abilities and relied too heavily on Plaintiff's subjective complaints. (R. at 26.) Additionally, Dr. Holden's marked and extreme findings seemed "inconsistent with the claimant's treatment notes." (R. at 26.) As an example, the ALJ stated that Plaintiff's "mental status examinations of record do not document psychomotor agitation or retardation, forgetfulness or difficulty in thinking or concentrating." (R. at 26-27.) Additionally, Plaintiff's symptoms stayed relatively stable when he complied with his medications and did not abuse opiates. (R. at 27.)

Substantial evidence supports the ALJ's assignment of little weight to Dr. Holden's opinion. First, the four psychiatric assessments that Dr. Holden conducted of Plaintiff do not support his medical opinion. Dr. Holden first performed a psychiatric assessment on August 26, 2014. (R. at 1029.) Plaintiff appeared cooperative with normal speech, thought processes, associations and computation. (R. at 1031.) Dr. Holden found that Plaintiff's judgment and memory remained intact, and that Plaintiff experienced no abnormal or psychotic thoughts. (R. at 1031.) He seemed oriented to person, place, time and situation. (R. at 1031.) Dr. Holden reported that both Plaintiff's mood and affect seemed euthymic, or within a normal range. (R. at

1031.) Dr. Holden discussed the effectiveness of Plaintiff's medications, stating that Citalopram helped Plaintiff's depression a fair amount, Seroquel and Trazodone improved Plaintiff's sleep and BuSpar managed Plaintiff's anxiety. (R. at 1031.) According to Plaintiff, Ritalin sharpened his focus and lessened his urges to use opioids, so Dr. Holden renewed this prescription. (R. at 1031.)

Dr. Holden next treated Plaintiff on January 13, 2015, describing Plaintiff as "stable." (R. at 1041.) He noted that Plaintiff seemed to be "coping quite well with depression" and had good focus. (R. at 1041.) Plaintiff reported having no cravings for opioids whatsoever. (R. at 1041.) Dr. Holden again noted that Plaintiff's speech, associations, thought processes, judgment and insight all remained intact and within a normal range. (R. at 1041-42.) He appeared oriented, and his mood and affect remained euthymic and within normal range. (R. at 1042.) Dr. Holden noted that Plaintiff only had "some mild symptoms OR some difficulty in social, occupational, or school functioning but [was] generally functioning pretty well." (R. at 1042.)

Dr. Holden performed another psychiatric assessment on May 5, 2015. (R. at 1049.) Plaintiff again appeared stable with intact memory, orientation, judgment and insight. (R. at 1050.) Dr. Holden noted only moderate difficulty in social, occupational or school functioning. (R. at 1050.)

Dr. Holden performed his final psychiatric assessment of Plaintiff on September 22, 2015. (R. at 1061.) He reported that Plaintiff's medications continued to manage his symptoms reasonably well, and that he did not notice many changes since May. (R. at 1061.) Plaintiff's memory, mood, speech and orientation remained normal and intact. (R. at 1062.) He again noted only moderate difficulty in social, occupational or school functioning. (R. at 1062.)

Dr. Holden's evaluations contrast with the medical opinion that he produced on June 1, 2015, thereby supporting the ALJ's assignment of weight. (R. at 856-63.) In his evaluations, Dr. Holden consistently reported mild to moderate difficulty in Plaintiff's social functioning. (R. at 1031, 1042, 1050, 1062.) However, in his opinion, Dr. Holden reported extreme difficulties in social functioning. (R. at 862.) Dr. Holden also consistently reported that Plaintiff had intact memory and orientation, and normal affect, associations and thought processes. (R. at 1031, 1042, 1050, 1062.) However, his opinion contradicted these observations when he noted that Plaintiff had extreme deficiencies in concentration, persistence and pace. (R. at 862.)

Next, objective medical evidence in the record provides further support for the ALJ's assignment of little weight to Dr. Holden's opinion. In March 2010, Plaintiff arrived in the emergency room, complaining of right flank pain, but the doctors noted no significant abnormalities and discharged him. (R. at 408-09.) On January 20, 2011, Plaintiff began a week-long stay in Mission Hospital after presenting to the emergency room with suicidal ideation and a desire to detox. (R. at 385, 398.) Plaintiff's initial report noted that he appeared alert and oriented with normal affect. (R. at 398.) Plaintiff stated that he used four to five Percocet per day and 120-150 mg of narcotics. (R. at 398.) His chart further noted his long history of opioid abuse and a six-month period of sobriety in 2010. (R. at 395.) His admitting physician observed needle tracks in Plaintiff's forearms, but noted that Plaintiff's systems otherwise tested unremarkable. (R. at 398-99.)

The admitting physician referred Plaintiff's case to Copestone, a division of the hospital specializing in mental health and addiction. (R. at 399.) Anne Traywick, N.P., evaluated Plaintiff at Copestone on January 21, 2011. (R. at 394-97.) Plaintiff tested positive for opiates, but other tests of his respiratory, cardiac, neurological and hematological systems yielded

negative results. (R. at 396.) That same day, Frederick Weigel, M.D., reported that Plaintiff had linear and organized thought processes, intact associations, conversational speech, a good fund of knowledge, good recent and remote memory, good attention and concentration, and an appropriate use of language. (R. at 393.) Dr. Weigel diagnosed Plaintiff with a substance-induced mood disorder and opiate dependence. (R. at 393.)

On January 22, 2011, Ralph Jones, M.D., noted that Plaintiff had a calm appearance, cooperative attitude and motivation for success. (R. at 390.) Even though Plaintiff had a depressed mood and constricted affect, he seemed fully alert and oriented. (R. at 390.) His concentration, abstraction, memory and language skills all appeared well-preserved. (R. at 390.) Dr. Jones ruled out any mood disorders and diagnosed Plaintiff with opiate abuse and dependence. (R. at 390.) In Plaintiff's discharge summary on February 2, 2011, Christopher Britt Peterson, M.D., provisionally diagnosed Plaintiff with an opioid-induced mood disorder, opioid dependence and ADHD, and ruled out a major depressive disorder or bipolar affective disorder. (R. at 383.) He prescribed Depakote to treat Plaintiff's irregular mood, Clonidine for Plaintiff's ADHD and Hydroxyzine as needed for anxiety. (R. at 405.) Dr. Peterson encouraged Plaintiff to follow-up with mental health treatment and twelve-step groups. (R. at 384.)

On February 27, 2011, Plaintiff presented to the emergency room at Blue Ridge Regional Hospital with suicidal ideations and a plan to overdose. (R. at 464, 474.) According to a system assessment, Plaintiff appeared alert, oriented and cooperative. (R. at 464.) Stressors included Plaintiff's separation from his wife, a failed attempt to reconcile with his daughter, unemployment and substance abuse. (R. at 474.) Plaintiff admitted to injecting 120-150 mg of Roxicet, Percocet and morphine daily. (R. at 474.)

On March 13, 2011, Plaintiff returned to the emergency room at Mission Hospital, with suicidal ideation resulting from an opiate relapse. (R. at 416-17.) Plaintiff appeared alert, oriented and in no acute distress. (R. at 417.) All of his vital signs tested stable. (R. at 417.) His admitting physician wrote that Plaintiff's suicidal thoughts "ultimately stem[med] from his opiate addiction and his attempt to pull himself off his medicines," and that Plaintiff had a "mood disorder, likely substance-induced component." (R. at 415, 418.)

Plaintiff's doctor referred him to Copestone for further evaluation. (R. at 418.) Evaluating Plaintiff's mental status, Dr. Peterson noted that despite his depressed mood and vague suicidal ideation, Plaintiff had a generally cooperative attitude, no psychomotor agitation or retardation, no distractibility, seemed well-oriented and appeared to have an intact memory for recent and remote events. (R. at 413, 415.) Dr. Peterson stated that Plaintiff could manage his mood disorder as long as he refrained from using opiates and managed his withdrawal symptoms. (R. at 415.) Dr. Peterson noted that Plaintiff wanted to detox again, and he saw no significant mood problems before Plaintiff began experiencing withdrawal. (R. at 413.)

On August 6, 2013, Plaintiff presented to Blue Ridge Regional Hospital from jail, complaining of atypical chest pain. (R. at 573.) His electrocardiogram ("EKG") yielded unremarkable results, and his pain resolved overnight. (R. at 571.) Steve North, M.D., the attending physician, stated that Plaintiff suffered no apparent distress, moved his neck without difficulty, had no irregular heartrate, rhythm or murmur, and denied any pain with palpitation. (R. at 574.) Dr. North suspected "possible secondary gain" resulting from Plaintiff's history of incarceration and unclear future. (R. at 574.) Plaintiff's chest x-ray showed no significant abnormalities, and he exhibited a normal heart rate response to a stress test. (R. at 585, 595.)

On October 22, 2013, Gary Shepherd, M.D., conducted a diagnostic evaluation in which he noted that Plaintiff had normal appearance, posture, mood and affect. (R. at 630.) Plaintiff also displayed good judgment, fair insight and impulse control, and demonstrated concentration and attention within normal limits. (R. at 630.) Dr. Shepherd diagnosed him with an unspecified mood disorder, opioid dependence (in remission) and ADHD. (R. at 630.) During the meeting, Plaintiff mentioned that he had started several projects to help him manage his depression and improve his mood. (R. at 627.)

On November 7, 2013, Plaintiff met with his therapist, Johnathan Crawford, LPC, for his first one-on-one therapy session. (R. at 641.) On November 13, 2013, Crawford screened Plaintiff for possible in-patient treatment at the Richmond Behavioral Health Authority ("RBHA") Crisis Stabilization Unit ("CSU"). (R. at 640.) Crawford noted that Plaintiff had started taking pain pills again and felt depressed about doing so. (R. at 644.) He noted Plaintiff's flat affect and lack of eye contact. (R. at 646.) Plaintiff entered the CSU for suicidal ideation and narcotic detox on November 13, 2013. (R. at 635.)

That same day, RBHA conducted a psychiatric evaluation when Plaintiff entered the program. (R. at 601-10.) Plaintiff exhibited normal appearance, eye contact, orientation, speech, thought content, memory and perception. (R. at 603, 607.) He exhibited a depressed mood and poor judgment, but normal range of affect. (R. at 606-07.) The evaluator diagnosed Plaintiff with a mood disorder, ADHD and opioid dependence. (R. at 609.)

Following a week in the CSU, Plaintiff met with Krista Casebolt, N.P., at Crossroads on November 21, 2013, for a psychological assessment. (R. at 635-39.) Casebolt observed that Plaintiff appeared well-nourished, hydrated and casually groomed. (R. at 637.) He seemed oriented, with intact memory and judgment. (R. at 638.) Plaintiff reported a low level of

depression, anxiety and feeling "much better" after his time at the CSU. (R. at 635, 638.) He usually slept through the night with no change in appetite. (R. at 638.)

Plaintiff failed to attend scheduled appointments on November 25, 2013, December 5, 2013, and January 3, 2014. (R. at 632-34.) During the summer of 2014, Plaintiff experienced recurring hematuria, or blood in his urine, which caused Plaintiff to experience suicidal thoughts. (R. at 666.) On July 26, 2014, Plaintiff stated that he felt "tired of all this" and that he "want[ed] to kill himself." (R. at 666.) Two days later, Plaintiff stated, "I just feel a whole lot better now that I have gotten some treatment," and affirmed that he had no suicidal ideations since his admission to the hospital. (R. at 804.)

Plaintiff began to attend regular therapy sessions with Crawford in August 2014 with intermittent psychiatric assessments by Dr. Holden. (R. at 1025.) On August 5, 2014, Crawford reported that Plaintiff's recent thirty-day incarceration left him feeling "moderately depressed but [with] no suicidal ideation." (R. at 1025.) Plaintiff believed that his health condition, impending divorce and general boredom caused his depression. (R. at 1025.) Plaintiff and Crawford discussed activities that Plaintiff could engage in like playing his guitar and riding his bike that would "relieve his boredom" and "distract negative thoughts." (R. at 1025.)

Crawford performed a diagnostic evaluation update on August 26, 2014. (R. at 1027.) Plaintiff discussed his depression, worry, problems with concentration and lack of sleep. (R. at 1027.) However, Crawford noted that Plaintiff had run out of Seroquel, a depression medication, and his ADHD medications. (R. at 1027.) Crawford noted that Plaintiff had a good prognosis if he complied with treatment. (R. at 1028.)

During a session with Crawford on October 13, 2014, Plaintiff endorsed "some depression" but also reported doing well. (R. at 1036.) He told Crawford that he had managed

his anxiety about the appointment by trying not to worry about it or predict the outcome. (R. at 1036.) In November 2014, Plaintiff cancelled his therapy session, because he "found some work to do" that day. (R. at 1038.)

On December 1, 2014, Crawford completed a clinical progress review, noting that Plaintiff's medications all seemed effective in managing Plaintiff's mental health symptoms. (R. at 1039.) He stated that Plaintiff had maintained his sobriety. (R. at 1039.) Plaintiff stated that his mood had dropped some because of the holidays and his lack of money. (R. at 1040.) Crawford discussed possible interventions to help with his "boredom" and to help him feel productive and distracted. (R. at 1040.) Plaintiff agreed to write letters to men that he knew from prison and to consider volunteering at the SPCA. (R. at 1040.)

After doctors put Plaintiff on new medication in January 2015, Plaintiff seemed "to be coping quite well with depression and ha[d] pretty good focus." (R. at 1041.) Plaintiff stated that he became bored at home which led to his depression, but that he could manage it. (R. at 1044.) On March 5, 2015, Crawford described Plaintiff as stable on medication. (R. at 1048.) Crawford also reported that behavioral interventions — including volunteer opportunities — helped relieve Plaintiff's depressive symptoms. (R. at 1048.)

On May 18, 2015, Crawford and Plaintiff again discussed volunteering at the SPCA and Plaintiff's efforts to fix his bike tire to get around. (R. at 1053.) Crawford noted "how much it helps [Plaintiff] to get out of the house and do things that distract him." (R. at 1053.)

On June 8, 2015, Crawford stated that Plaintiff had maintained his sobriety and managed his depression. (R. at 1054.) During an appointment on July 6, 2015, Plaintiff expressed his frustration about his inability to go on a family vacation due to his probation. (R. at 1055.)

However, Plaintiff developed plans to get out of the house and "go to the farm . . . and help out to keep him distracted." (R. at 1055.)

On August 3, 2015, Plaintiff reported a happy mood and improvement since his last session. (R. at 1056.) Plaintiff spoke to Crawford about getting out of the house more and about his plans to attend an upcoming wedding. (R. at 1056.) Additionally, he spoke about a recent visit from his estranged daughter and how much he enjoyed that. (R. at 1056.) Crawford praised him for his "efforts to get better and push [him]self." (R. at 1056.) Similarly, on September 8, 2015, Crawford noted that Plaintiff continued to take his medications with positive results. (R. at 1058.) While Plaintiff still struggled with some late afternoon focus and concentration, he maintained his depression at baseline and remained sober. (R. at 1058.)

In January 2016, Plaintiff twice reported functioning well on his medications. (R. at 1066-67.) Around January 18, 2016, Plaintiff began to take care of his elderly mother who had formerly cared for him. (R. at 1067.)

These aforementioned medical records contradict Dr. Holden's extreme findings in his opinion and support the ALJ's assignment of limited weight. Plaintiff demonstrated consistently normal memory, concentration and affect, as well as good impulse control with no psychomotor agitation. (R. at 390, 464, 630, 638.) By contrast, Dr. Holden cited extreme deficiencies in these areas. (R. at 857.) Additionally, as the ALJ noted, Plaintiff's symptoms appeared relatively stable when he complied with his medications. (R. at 415, 635, 644, 804.)

Finally, Plaintiff's own statements and admitted daily activities further support the conclusions of the ALJ. In a January 14, 2014 function report, Plaintiff stated that he had no problems with personal care, talked on the phone three times per week, went to church regularly and could still pay bills, count change, handle a savings account and use a checkbook. (R. at

264-65.) He reported that he did laundry once per week. (R. at 263.) Plaintiff also watched television daily, helped his mother clean the house and enjoyed fishing, camping and walking. (R. at 828.)

During the hearing, Plaintiff testified that he could handle his personal care, including showering and dressing. (R. at 50.) He stated that he usually spent his days watching TV and walking to and from the kitchen and living room. (R. at 50.) He also talked with his mother and occasionally accompanied her to the mailbox or grocery store. (R. at 50-51.) Plaintiff spoke to his brother, sisters and other family by phone. (R. at 51.) These statements demonstrate that Plaintiff retained greater functionality than Dr. Holden opined.

The ALJ appropriately afforded Dr. Holden's opinion little weight, because his opinion did not comport with his treatment notes, other objective medical evidence and Plaintiff's own statements. While Dr. Holden opined about marked restrictions in Plaintiff's daily living and extreme difficulties in social functioning, Dr. Holden's treatment notes reported only moderate difficulty in social, occupational or school functioning. (R. at 1050.) Dr. Holden's opinion also noted extreme deficiencies in concentration, persistence or pace. (R. at 857.) However, Plaintiff's medical records demonstrate consistently normal memory, concentration and affect, and good impulse control with no psychomotor agitation. (R. at 390, 464, 630, 638.) Even Dr. Holden's psychiatric assessments reported that Plaintiff had an intact memory, no abnormal or psychotic thoughts and normal thought processes and judgment. (R. at 1031, 1042.) Through Dr. Holden's own treatment notes, objective medical evidence and Plaintiff's admitted daily activities, the evidence supports the ALJ's assessment of Dr. Holden's opinion.

## 2. Dr. Hrncir's Opinion

At the request of Disability Determination Services, Dr. Hrncir performed a consultative examination of Plaintiff on August 15, 2014. (R. at 825.) Plaintiff reported information about his medical and mental health history, education and training, substance abuse issues, living conditions, finances and daily activities. (R. at 825-30.) Dr. Hrncir conducted a mental status examination after which she noted that Plaintiff presented as cooperative, oriented and casually groomed but "with a depressed mood and low energy." (R. at 828.) Plaintiff recalled well his birth date, age, address and other personal information. (R. at 828.) He recalled some historical information, including the first and current president of the United States, but could not perform a logical, abstract reasoning test. (R. at 828.) He recalled three out of three forward digit sequences, but recalled zero out of three backward digit sequences. (R. at 828.) Plaintiff reported symptoms of anxiety and depression that fluctuated monthly and symptoms of panic attacks which occurred bimonthly. (R. at 828-29.) Dr. Hrncir noted symptoms of anxiety during the examination. (R. at 829.) Plaintiff self-reported intrusive memories of trauma and flashbacks, and hearing sounds when no one was around. (R. at 829.) Plaintiff denied current suicidal thoughts or ideations, but he reported a past suicide attempt. (R. at 829.) Plaintiff denied violent behavior and thoughts about hurting others. (R. at 829.) Dr. Hrncir noted that Plaintiff had a decreased appetite and had lost weight since June 2013. (R. at 829.) Plaintiff reported difficulty falling asleep before he started taking his medication. (R. at 829.)

Dr. Hrncir opined that Plaintiff could perform simple, repetitive tasks, but would have difficulty with complex, detailed tasks because of his depression, anxiety and post-traumatic stress disorder. (R. at 829.) She stated that he would need additional supervision to consistently complete work activities on a normal work day. (R. at 829.) While Plaintiff's symptoms could

affect his interactions with others, Dr. Hrncir opined that Plaintiff could accept instructions from supervisors. (R. at 829-30.) She stated that the usual stresses of competitive work would moderately to severely exacerbate Plaintiff's symptoms. (R. at 830.)

The ALJ afforded Dr. Hrncir's opinion partial weight, because the treatment records supported her findings of Plaintiff's ability to complete simple, repetitive tasks, but "her concerns about consistency and stress appear to unduly credit the claimant's subjective allegations and are not consistent with the weight of the overall evidence." (R. at 26.) For example, when Plaintiff complied with his treatment, he could think normally, speak normally, cooperate with others and access memories and knowledge appropriately. (R. at 26.)

Substantial evidence supports the ALJ's decision to afford Dr. Hrncir's opinion partial weight. Plaintiff's medical record supports the ALJ's conclusion about Plaintiff's ability to think, speak and interact appropriately when compliant with his medications. (R. at 1031, 1042, 1050, 1062.) Generally, Plaintiff could manage his depressive symptoms when he complied with his prescribed medications. (R. at 1041, 1058, 1062.) Indeed, his anxiety and depression remained well-controlled when he stayed sober and took his medications. (R. at 635, 804, 1025, 1039, 1058.) Dr. North reported that Plaintiff's symptoms might have resulted from secondary gain from his incarceration and uncertain plans. (R. at 574.) Plaintiff repeatedly discussed social activities with Crawford to relieve his boredom, including writing letters to men in prison and volunteering. (R. at 1025, 1040, 1048, 1053.) Moreover, Plaintiff's own statements demonstrate that Plaintiff could maintain more independence and self-care than suggested by Dr. Hrncir. (R. at 264-65.) Plaintiff's memory and ability to recall recent and remote events also remained intact when he complied with treatment. (R. at 415, 630, 638, 1031, 1042, 1062.)

Substantial evidence supports the ALJ's assignments of weight for both Dr. Holden and Dr. Hrncir's opinions. Therefore, the ALJ did not err in his assignments of weight.

**B. The ALJ Properly Addressed the Post-hearing Objections to the VE's Testimony.**

Next, Plaintiff argues that the ALJ improperly relied on the VE's testimony without fully addressing Plaintiff's post-hearing objections. (Pl.'s Br. at 5.) Plaintiff objected to the expertise of the VE, to his use of the Dictionary of Occupational Titles ("DOT") in determining available jobs and to Plaintiff's ability to perform the identified jobs given his limitation to occasional interaction with co-workers. (Pl.'s Br. at 5-13.) Plaintiff also argues that the ALJ failed to adequately discuss the rebuttal evidence to the VE's testimony. (Pl.'s Br. at 6.) Plaintiff relies on § I-2-5-55 (2016) of the Hearings, Appeals, and Litigation Law Manual ("HALLEX") to support this argument. (Pl.'s Br. at 7.) Defendant responds that Plaintiff based his challenge on an untimely, generic document that he could have raised at the hearing; therefore, the ALJ adequately addressed this submission and exercised his discretion in not relying on it. (Def.'s Br. at 14-15.) Defendant challenges Plaintiff's reliance on the HALLEX, stating that the manual "lacks the force of law and does not create judicially enforceable rights." (Def.'s Br. at 18-19.)

When objecting to a VE's testimony, a plaintiff must raise the argument during the hearing or risk waiving it. *See Sayre v. Chater*, 113 F.3d 1232 (Table), 1997 WL 232305, at *2 (4th Cir. May 8, 1997) (finding plaintiff's "broadside attack on the [VE]'s testimony" waived where plaintiff failed to raise the issue with either the ALJ or the Appeals Council); *Wilkins v. Barnhart*, 69 F. App'x 775, 782 (7th Cir. 2003) (finding plaintiff's argument about inappropriate hypothetical question waived when plaintiff cross-examined VE during hearing and never raised the issue); *Hammond v. Chater*, 116 F.3d 1480 (Table), 1997 WL 338719, at *3 (6th Cir. June 18, 1997) (finding plaintiff's objection about skill level of jobs listed by VE waived because

plaintiff failed to raise issue during hearing). The Fourth Circuit has not yet addressed this specific issue regarding the waiver of post-hearing objections, although a number of district courts in this circuit have. *See Rogers v. Berryhill*, 2018 WL 1308952, at *4 (W.D. N.C. Mar. 13, 2018) (remanding and instructing ALJ to review plaintiff's post-hearing objections only because of parties' faulty arguments to the court and numerous other mistakes in reviewing the record); *Jenkins v. Colvin*, 2016 WL 4373701, at *8 (W.D. N.C. Aug. 12, 2016) (finding plaintiff's post-hearing objection to VE testimony waived because Plaintiff had opportunity to challenge VE's testimony during hearing and failed to do so).

However, the ALJ has the clear duty "to make findings of fact and to resolve conflicts in the evidence." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). If a plaintiff raises a valid post-hearing objection that provides a contrary opinion to the VE's testimony, the ALJ can evaluate the conflicting opinions and reach a conclusion as long as the ALJ provides some explanation for his decision. *See Rosado v. Berryhill*, 2018 WL 816578, at *14 (E.D. Va. Jan. 22, 2018) (finding that ALJ adequately explained his reliance on VE's testimony over another expert opinion when ALJ found VE's testimony "more persuasive and consistent with reality"); *Reeves v. Berryhill*, 2017 WL 3433706, at *11 (M.D. Pa. Aug. 10, 2017) ("ALJ's protracted explanation for why she relied upon [testifying VE's] opinion . . . was more than adequate to support that reliance"); *McCaffrey v. Colvin*, 978 F.Supp. 2d 88, 92 (D. Mass. 2013) (finding that ALJ "simply d[id] his job, which is to weigh credibility, resolve conflicting evidence, and draw inferences from the evidence in record" when he preferred the opinion of one VE over another).

Here, Plaintiff requested that the ALJ leave the record open for thirty days post-hearing to submit any missing medical records and to address "vocational testimony about specific jobs and the incidence of those jobs in the national economy." (R. at 325.) During the hearing,

Plaintiff objected to the VE's expertise and his ability to determine the number of available jobs. (R. at 64-65.) Plaintiff based this objection on the VE's use of the DOT in determining job numbers. (R. at 64.) He stated that the VE's process for determining these numbers did not correspond to a reliable scientific method. (R. at 64.) However, Plaintiff stated that he would accept testimony from the VE that no jobs existed in the national economy that Plaintiff could perform. (R. at 64-65.) The ALJ overruled these objections, stating that Plaintiff could not both object to the expertise of the VE and accept his testimony when it suited Plaintiff. (R. at 65.)

On March 22, 2016, Plaintiff submitted a post-hearing brief objecting to five elements of the VE's testimony: (1) that the VE did not have the training, education or experience to give an opinion on job incidence data; (2) that the VE based the job incidence data on unreliable and unsupported sources including OccuBrowse and Job Browser Pro; (3) that Plaintiff could not perform the positions identified by the VE because current sources of job information dictated that they required more than superficial interaction with co-workers and supervisors; (4) that Plaintiff could not perform the jobs identified because current sources of information showed that these positions required more than unskilled abilities; and, (5) that Plaintiff could not perform the DOT job of inspector given his limitations. (R. at 335-43.)

To support his third objection regarding co-worker interaction, Plaintiff submitted a letter by Paula F. Santagati, a senior vocational rehabilitation counselor for the Massachusetts Rehabilitation Commission, which stated that a limitation of occasional interaction with co-workers and supervisors prevented an individual from working in any job with a probationary or training period. (R. at 374-76 (the "Santagati Report").) Dated October 1, 2015 — more than six months before Plaintiff's hearing — the Santagati Report discussed the training programs for

entry level jobs at CVS, Gillette, Merry Maids, Shaw's Healthcare Services and Benchmark Senior Living. (R. at 374-75.)

In his decision, the ALJ addressed the first and second objections that Plaintiff raised regarding job incidence data. (R. at 28-29.) He referenced the objections that Plaintiff made at the hearing, as well as the similar objections made in Plaintiff's post-hearing brief. (R. at 28-29.) The ALJ again overruled these objections, stating that "the vocational expert testified regarding the sources of his job numbers, the recency of the information, and his methodology in deriving numbers. Use of vocational expert testimony in regard to job numbers is well settled." (R. at 29.) Plaintiff properly objected to the VE's testimony regarding job numbers during the hearing, and the ALJ overruled it both orally and in his decision. (R. at 28-29, 64-65.) The ALJ explained his reliance on both the VE's testimony and conclusions. (R. at 29.) Therefore, the ALJ adequately addressed the first two objections listed in Plaintiff's post-hearing brief.

However, Plaintiff argues that the ALJ failed to address his specific objections regarding Plaintiff's work-preclusive social limitations that he provided in his post-hearing memorandum, because the ALJ never mentioned the Santagati Report. (Pl.'s Br. at 6-9.) Plaintiff objected to the positions offered by the testifying VE, stating that "this opinion is not reliable and is not supported by substantial evidence because current labor market research and reliable sources of job information dictate that these positions would require more than superficial interaction with coworkers and supervisors." (R. at 339.) Plaintiff introduced the Santagati Report in support of this proposition. (R. at 374.)

Several courts have received reports from Santagati containing identical testimony regarding work-preclusive social limitations, and have rejected the testimony for its lack of specificity, expertise and knowledge of the case in question. *Rosado*, 2018 WL 816578, at *14

(affirming ALJ's treatment of Santagati's report due to her conclusions that "def[y] common sense" and because plaintiff employed her solely to offer alternate testimony to the VE); *Kidd v. Berryhill*, 2018 WL 3040894, *4 (E.D. Ky. June 19, 2018) (rejecting Santagati's "most generalized (and quite radical)" Report, because it "said **utterly nothing** specific about [the plaintiff's] life, health, ability to work, or case" (emphasis in original)); *Lara v. Berryhill*, 2017 WL 7790109, at *9-10 (S.D. Tex. Dec. 4, 2017) ("Santagati identifies no factual basis beyond her own opinion as to why every single job in America requires more than occasional interaction with others. . . . Santagati's opinion is not sufficiently supported by any evidence.").

In *Reeves v. Berryhill*, the court declined to accept the plaintiff's post-hearing objection to the testifying VE's testimony. 2017 WL 3433706, at *11 (M.D. Pa. Aug. 10, 2010). There, the plaintiff submitted the same report by Santagati that stated that the plaintiff's limitation to occasional interaction with co-workers prevented him from performing any jobs identified by the testifying VE. *Id.* However, the court held that because the ALJ had "properly characterized [the testifying VE] as an expert . . . and no objection to the contrary was made by [Reeves'] attorney at the hearings," the ALJ properly relied on the testimony over Santagati's letter. *Id.* The court did not require the ALJ to explain why she ignored Santagati's opinion. *Id.*

Here, Plaintiff's post-hearing objection regarding work-preclusive social limitations and the accompanying Santagati Report raised a new objection not otherwise raised at the hearing. (R. at 339-40, 374-75.) Moreover, as in *Rosado*, *Kidd*, *Lara* and *Reeves*, the Santagati Report made a generalized statement that limiting an individual to occasional interaction with co-workers and supervisors "precludes all work," but it did not specifically speak to Plaintiff or the jobs listed by the testifying VE. (R. at 374.) Indeed, the record does not indicate that Santagati reviewed Plaintiff's case at all. (R. at 374-75.) Consequently, Plaintiff waived this objection,

and the ALJ appropriately ignored it. (R. at 28-29, 64-65, 374-75;) *Sayre*, 1997 WL 232305, at *2; *Wilkins*, 69 F. App'x at 782; *Hammond*, 116 F.3d at 1480.

Even assuming that Plaintiff had properly raised this third objection, the ALJ explained his reliance on the VE's conclusion over Santagati's in the same manner as the ALJ in *Reeves*. 2017 WL 3433706, at *11. The ALJ explicitly stated that he had considered the arguments submitted in Plaintiff's post-hearing brief and overruled them. (R. at 28-29.) He further explained that the VE had appropriately "testified regarding the sources of his job numbers, the recency of the information, and his methodology in deriving numbers." (R. at 29.) He assessed the expertise of the VE, weighed the conflicting evidence and deemed the VE a reliable source of information. (R. at 29.) As required, the ALJ also clearly explained his conclusion. (R. at 29.)

Additionally, the HALLEX provisions that Plaintiff relies upon to insist that the ALJ rule on Plaintiff's post-hearing objections fall short. Intra-agency manuals do not bind the Agency. *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) ("the Claims Manual is not a regulation. It has no legal force, and does not bind the SSA. Rather, it is a 13-volume handbook for internal use by thousands of SSA employees.") As this Court has previously held, "interpretations contained in policy statements, agency manuals and enforcement guidelines [including HALLEX] lack the force of law." *Parham v. Colvin*, 2015 WL 1649143, at *15 (E.D. Va. Apr. 13, 2015), *rev'd and remanded on other grounds sub nom. Parham v. Comm'r of Soc. Sec.*, 627 F. App'x 233. (citing *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)). While the Fourth Circuit has not formally addressed this issue, many district courts within this Circuit have held that the HALLEX does not create judicially enforceable rights. *See e.g.*, *Young v. Colvin*, 2014 WL 1874984, at *3 (W.D.N.C. May 9, 2014); *Shrader v. Astrue*, 2013 WL 1192315, at *3 (N.D.W.

Va. Mar. 22, 2013); *Harris v. Astrue*, 2012 WL 7785082, at *6 (N.D.W. Va. Nov. 30, 2012); *Melvin v. Astrue*, 602 F. Supp. 2d 694, 704 (E.D.N.C. 2009).

Because the ALJ had no duty to follow the provisions in the HALLEX cited by Plaintiff and consider objections that Plaintiff failed to raise during the hearing, the ALJ did not err by failing to specifically explain why he rejected the Santagati Report.

Likewise, Plaintiff waived his final two post-hearing objections by failing to raise them during the hearing. Moreover, Plaintiff's final two post-hearing objections depend on Plaintiff's insistence that the ALJ use a more updated source of job information than the DOT. (R. at 335-43.) Plaintiff claims that more recent data shows that an individual cannot perform the jobs listed by the VE at an unskilled level. (R. at 340-41.) However, under Agency regulations, the DOT remains the primary source of reliable job information and work requirements for the the Agency at steps 4 and 5 of the sequential evaluation process. SSR 00-4p, at 2. Therefore — even assuming that Plaintiff had validly raised these objections to the use of the DOT — they lack merit, because the DOT remains a valid source of job data used by the SSA.

Additionally, the VE did not solely rely on the DOT in his assessment. Instead, he also used OccuBrowse and information from the Bureau of Labor Statistics to reach his conclusions about the jobs available to Plaintiff. (R. at 70-71.) According to a December 28, 2009, internal memorandum from the SSA's Director of Field Procedures, the Agency considers OccuBrowse an acceptable version of the DOT and believes that the program meets the requirements of SSR 00-4p. Memorandum from Susan Swansiger, Dir., Div. of Field Procedures, SSA, to Reg'l Mgmt. Officers (Dec. 28, 2009). The Director also instructed the memorandum's recipients to share its contents with all ALJs. *Id.*

The ALJ properly addressed Plaintiff's timely objections to the VE testimony. The ALJ had no duty to address those objections that Plaintiff made only in his post-hearing brief. Nonetheless, the ALJ adequately explained his reliance on the testifying VE's conclusions. Consequently, the ALJ did not err.

## C. Substantial Evidence Supports the ALJ's Credibility Assessment.

Finally, Plaintiff argues that the ALJ neglected to consider his thirteen-year work history in the credibility determination. (Pl.'s Br. at 25-27.) Defendant responds that although Plaintiff's work history contributes to the ALJ's credibility assessment, Agency policy does not require the ALJ to discuss or even consider it. (Def.'s Br. at 25-27.) Additionally, the ALJ based his decision on the entire record. (Def.'s Br. at 25-27.)

The ALJ must evaluate a claimant's RFC after step three of the sequential analysis, but before deciding whether a claimant can perform past relevant work at step four. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1), 416.920(e)-(f), 416.945(a)(1). In determining Plaintiff's RFC, the ALJ must consider all presented evidence when evaluating a claimant's symptoms, including "information about [the claimant's] past work record." §§ 404.1529(c)(3), 416.929(c)(3). In addition to considering past work, the ALJ considers a variety of other information including statements about the claimant's symptoms, evidence submitted by the claimant's medical sources and evidence submitted by SSA employees and others. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the

extent of the symptoms and must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p, at 5-6, 11.[4]

Various district courts have acknowledged that the ALJ should take work history into account and that a robust work history strengthens a claimant's credibility. *See, e.g., Bladley v. Colvin*, 2016 WL 5928811, at *14 (N.D. Ill. Oct. 11, 2016) ("[A] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.") (citing *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015)). Further, district courts have noted that an attempt to return to work enforces a claimant's credibility. *See, e.g., Moncus v. Colvin*, 2013 WL 4854518, at *3 (E.D.N.C. Sept. 11, 2013) ("[P]laintiff's attempts to return to work . . . support his credibility."). However, while work history remains relevant to a credibility determination, it is but one of many factors in consideration and not controlling. *Maner v. Colvin*, 2014 WL 4656383, at *5 (D.S.C. Sept. 17, 2014).

Courts in the Fourth Circuit have confirmed that "the ALJ's mere failure to mention . . . work history explicitly does not warrant remand or reversal in the face of [the] otherwise supported findings." *Terrell v. Colvin*, 2015 WL 966256, at *13 (E.D. Va. Mar. 4, 2015); *see also Pope v. Colvin*, 2016 WL 1211807, at *12 (W.D. Va. Mar. 8, 2016), *R. & R. adopted*, 2016 WL 1226972 (W.D. Va. Mar. 28, 2016) ("[E]ven though the ALJ did not explicitly address the correlation between [the claimant's] work history and her credibility, the ALJ was well aware of her work history, as he developed the evidence of such . . . during the hearing."); *Cooper v. Astrue*, 2011 WL 6742500, at *7 (E.D. Va. Nov. 8, 2011), *R. & R. adopted*, 2011 WL 6749018

---

[4]     On March 16, 2016, the Agency issued SSR 16-3p, which rescinded and superseded SSR 96-7p, eliminating the credibility finding at issue here. Plaintiff filed his claim on December 10, 2012, before SSR 16-3p took effect. (R. at 219-21.) As previously stated, the Agency does not have the power to engage in retroactive rulemaking. Thus, the Court will review the ALJ's decision under SSR 96-7p.

(E.D. Va. Dec. 22, 2011) (finding that work history alone does not contravene an ALJ's credibility finding where substantial objective medical evidence in the record does not support a plaintiff's subjective complaints). Thus, when the ALJ appropriately considers all relevant factors, hears the claimant's testimony and observes his demeanor, the ALJ's credibility determination deserves deference. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Indeed, the ALJ's credibility determinations must receive great deference from the Court. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems. Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Here, the ALJ concluded that Plaintiff's impairments could have caused his alleged symptoms. (R. at 22.) However, Plaintiff's statements concerning intensity, persistence and the limiting effects of these symptoms were not entirely consistent with both the medical evidence and other evidence in the record. (R. at 22.) The ALJ acknowledged Plaintiff's work history both during the hearing and in his decision. (R. at 27, 43.) During the hearing, the ALJ discussed Plaintiff's work history, including the companies that he worked for and the years in which he had worked for them. (R. at 43, 51-53.) The ALJ questioned Plaintiff about the hours worked at his previous job, the salary that he had earned and his reasons for leaving. (R. at 51-

53.) In his opinion, the ALJ also noted Plaintiff's prior work as a heavy equipment operator, and that Plaintiff could no longer perform his past relevant work. (R. at 27.)

Although the ALJ did not explicitly discuss Plaintiff's work history in his discussion of credibility, he supported his determination with other substantial evidence. (R. at 22-24.) Regarding Plaintiff's heart disease, the ALJ mentioned the many negative and "unremarkable" EKGs, stress tests, angiograms and cardiac examinations in Plaintiff's medical record. (R. at 22.) The ALJ also noted a hospital record suggesting that Plaintiff's symptoms resulted from "possible secondary gain," or the desire to escape from his present incarceration and uncertain future. (R. at 22.) Regarding Plaintiff's GERD, the ALJ noted that many of the times that Plaintiff sought treatment for this condition, doctors diagnosed him with mild constipation. (R. at 22.) Additionally, doctors resolved Plaintiff's urinary symptoms with a Foley catheter and without surgery. (R. at 22.) Finally, in discussing Plaintiff's mental health history, the ALJ stated that "the totality of the claimant's mental health treatment records demonstrate that he is stable when compliant with medication and abstinent from abusing substances." (R. at 24.)

The ALJ appropriately considered a variety of factors and relied on the record in his credibility assessment. The ALJ also adequately considered Plaintiff's work history in his decision. Additionally, no other exceptional circumstances exist in the record prompting the Court not to give the mandated deference to the ALJ's decision. *Eldeco, Inc.*, 132, F.3d at 1011.

## V.     CONCLUSION

For the reasons set forth above, the Court hereby DENIES Plaintiff's Motion for Summary Judgment (ECF No.14), GRANTS Defendant's Motion for Summary Judgment (ECF No.16) and AFFIRMS the final decision of the Commissioner.

An appropriate Order consistent with this Memorandum Opinion shall be issued. Let the Clerk forward a copy of this Opinion to all counsel of record.

It is so ORDERED.

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: August 9, 2018